UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEPHEN A. KONIGSBERG
   Plaintiff,

   v.                          CIVIL ACTION NO.
                                   08-10120-NMG

MICHAEL J. ASTRUE, Commissioner
Social Security Administration,
   Defendant.

**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S MOTION FOR AN ORDER REVERSING OR REMANDING THE**
**DECISION OF THE COMMISSIONER (DOCKET ENTRY # 8); DEFENDANT'S**
**MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 11)**

**March 8, 2010**

**BOWLER, U.S.M.J.**

Pending before this court is a motion by plaintiff Stephen Konigsberg ("plaintiff") seeking to reverse the decision of defendant Michael Astrue, Commissioner of the Social Security Administration ("the Commissioner"). (Docket Entry # 8). The Commissioner moves for an order affirming the decision. (Docket Entry # 11). On November 30, 2009, this court held a hearing and took the motions (Docket Entry ## 8 & 11) under advisement.

PROCEDURAL HISTORY

On June 3, 2004, plaintiff filed an application for disability insurance benefits and supplemental security income with the Social Security Administration ("SSA"). (Tr. 31-33). The claims were denied on January 12, 2005, and again denied upon reconsideration on June 29, 2005. (Tr. 13). Subsequently,

plaintiff requested a hearing on August 30, 2005, which took place on April 24, 2007.  (Tr. 13).  After plaintiff's examination, the Administrative Law Judge ("ALJ") found plaintiff to be disabled on April 22, 2007 when plaintiff turned 55.  (Tr. 424).  The ALJ requested a supplemental hearing with a medical expert to determine whether plaintiff was disabled prior to this date.  (Tr. 424).  A supplemental hearing occurred on August 2, 2007.  (Tr. 13).  On August 29, 2007, the ALJ ruled that plaintiff was disabled when he turned 55 on April 22, 2007, but not before that date.  (Tr. 12-14).  Plaintiff appealed to the SSA to review the decision on October 11, 2007, and the appeal was denied on November 30, 2007.  (Tr. 5-8).  On January 25, 2008, plaintiff filed this action against the Commissioner pursuant to 42 U.S.C. § 405(g).  (Docket Entry # 1).


<u>FACTUAL BACKGROUND</u>

I.  <u>Plaintiff's Medical History</u>

Plaintiff graduated from vocational high school in 1970 with training as an auto mechanic.  (Tr. 69).  He was a truck driver for an electrical supply company from approximately 1982 to 1992.  (Tr. 72).  At this job, plaintiff's duties included loading and unloading the truck and lifting, carrying or pushing pipes, wire rolls, electrical boxes and electrical supplies for a distance of two to 15 feet.  (Tr. 73).  The weight of these objects ranged

from five to 480 pounds.  (Tr. 73).  Plaintiff stated that he initially injured his back while lifting heavy poles at work. (Tr. 70).

On March 26, 1992, Craig Honer, D.C. ("Dr. Honer"), a chiropractor, treated plaintiff and diagnosed him with 722.2 Lumbar Disc Syndrome Grade 3 stemming from a work injury in 1989. (Tr. 128).  Plaintiff had a disc herniation at the L5/S1 level towards the right side which explained the weakness and pain plaintiff felt in his right leg.  (Tr. 126).  Dr. Honer opined that plaintiff could do light work, lift a maximum of 20 pounds and could frequently lift or carry objects weighing up to ten pounds.  (Tr. 128).  Dr. Honer prescribed treatment three times per week to ease the right leg pain from plaintiff's herniated disc.  (Tr. 128).

On June 2, 2004, plaintiff went to Texsan Heart Hospital in Texas after a myocardial infarction.  (Tr. 129).  The next day plaintiff underwent a cardiac catheterization procedure.  (Tr. 129).  The procedure entailed a left heart catheterization, left ventriculogram and percutaneous coronary intervention including stenting and angioplasty.  (Tr. 129).  At this time, plaintiff had a medical history of hypertension and diabetes.  (Tr. 129). William Wu, M.D. ("Dr. Wu"), plaintiff's cardiologist at Texsan Heart Hospital, concluded that plaintiff had coronary artery disease at that time and recommended aspirin and Plavix for at

least one year.  (Tr. 131).  Dr. Wu also recommended beta blocker
therapy and an Ace inhibitor if tolerable by plaintiff as well as
aggressive risk factor modification for plaintiff's diabetes and
high blood pressure.  (Tr. 131).  Plaintiff was discharged on
June 4, 2004, with instructions for a low fat, low cholesterol
and diabetic diet plan.  (Tr. 136).  Plaintiff also received
instructions to follow up with a cardiologist one month later.
(Tr. 137).

Plaintiff went to Wilson Memorial Hospital in Texas on July
2, 2004, complaining of chest pain.  (Tr. 186).  Plaintiff had a
chest X-ray and his heart size was stable and within the upper
limits of normal.  (Tr. 195).  At discharge, plaintiff was
instructed to follow up with Dr. Wu on July 5, 2004.  (Tr. 197).
Plaintiff visited the Central Cardiovascular Institute of San
Antonio, Texas on July 23, 2004, for an exercise stress test.
(Tr. 311).  His exercise capacity was good although his heart
rate was inadequate.  (Tr. 311).

On October 12, 2004, plaintiff went to Quality Care Medical
Group in Texas because of chest pain, occasional shortness of
breath, joint pain and muscle weakness.  (Tr. 210-11).  Hameed
Dosunmu, M.D. ("Dr. Dosunmu"), plaintiff's treating physician at
Quality Care Medical Group, examined him and noted that he had a
medical history of diabetes mellitus, hypertension, arthritis and
myocardial infarction.  (Tr. 210).  Plaintiff also reported to

4

Dr. Dosunmu that he had a family history of diabetes, heart trouble and high blood pressure.  (Tr. 210).  Additionally, plaintiff used tobacco and occasionally used alcohol.  (Tr. 210).  Upon examination, Dr. Dosunmu found plaintiff to have normal range of motion for the spine, upper extremities and lower extremities pursuant to the standards of the American Association of Orthopedic Surgeons.  (Tr. 213).  Dr. Dosunmu found plaintiff to have normal gait with no signs of unsteadiness.  (Tr. 212).  Dr. Dosunmu also observed that plaintiff could stand on his heels and toes without difficulty, could squat and get up without difficulty and could bend over half way.  (Tr. 212).  Plaintiff had a chest X-ray and a spine X-Ray during this visit.  (Tr. 214).  There was no evidence of acute cardiopulmonary disease from the chest X-ray and the spine X-ray showed degenerative changes at C5-6 and C6-7 as well as C7-T1 anterolisthesis.  (Tr. 214).

On November 10, 2004, Dr. Dolan, a non-examining medical consultant to SSA, completed a residual functional capacity ("RFC") form with respect to plaintiff's physical limitations. (Tr. 202-09).  Dr. Dolan concluded that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for approximately six hours during an eight hour work day, sit for approximately six hours during an eight hour work day and use a push or pull motion without limitation.  (Tr. 203).  Dr.

Dolan also found plaintiff capable of climbing, balancing,
stooping, kneeling, crouching and crawling.  (Tr. 204).  Dr.
Dolan opined that plaintiff's claims were not supported by the
medical records.  (Tr. 207).  As support for his findings, Dr.
Dolan noted that plaintiff had a normal gait, was able to stand
on his heels and toes without difficulty and was able to squat
down and get up without difficulty.  (Tr. 209).

On December 16, 2004, plaintiff visited Quality Care Medical
Group for a mental status evaluation, complaining of stress,
anger, confusion and memory loss.  (Tr. 216).  Plaintiff told
Russel Thompson, Ph.D. ("Dr. Thompson"), plaintiff's evaluating
psychologist, that he was living on a farm and helping the
landlord with mechanic work.  (Tr. 216).  Plaintiff also informed
the examiner that he worked as a convenience store cashier for a
year or less, but quit because of back pain.  (Tr. 216).  The
examiner diagnosed plaintiff with adjustment disorder with
depressed mood and rated his functioning at a GAF[1] of 60.[2]  (Tr.

---

[1]  GAF is an acronym for the Global Assessment of
Functioning Scale.  GAF considers psychological, social and
occupational functioning on a hypothetical continuum of mental
health illness.  It does not include impairments in functioning
due to physical (or environmental) limitations.  (Docket Entry #
9); American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders, p. 32 (2000).

[2]  A GAF of 51-60 represents "moderate symptoms (e.g., flat
affect and circumstantial speech, occasional panic attacks) or
moderate difficulty in social, occupational or school functioning
(e.g., few friends, conflicts with peers or coworkers)."
American Psychiatric Association, Diagnostic and Statistical

217).  The examiner also noted plaintiff's health, occupational, economic and social difficulties in the diagnosis.  (Tr. 217). Dr. Thompson found that plaintiff was able to control his anger, that his purported problems with memory and confusion were not observed during the evaluation and that his cognitive functioning was relatively intact.  (Tr. 217).

On January 1, 2005, Mahdi Sharifian, M.D. ("Dr. Sharifian"), a non-examining psychiatric consultant to SSA, evaluated plaintiff's medical records and found plaintiff's mental impairment not severe.  (Tr. 218).  According to the evaluation, plaintiff had an adjustment disorder.  (Tr. 221).  Additionally, his daily activities were not restricted, he had mild difficulty with social functioning, he had no difficulty maintaining concentration, persistence or pace and he had no episodes of decompensation.  (Tr. 228).

On February 9, 2005, plaintiff went to the Baptist Medical Center complaining of chest pain.  (Tr. 232).  Plaintiff had a second myocardial infarction and underwent angioplasty, stenting of the right coronary artery, left heart cardiac catheterization and coronary arteriography.  (Tr. 233, 242).  Dr. Wu recommended aspirin, Plavix and risk factor modification for plaintiff.  (Tr. 243).

Plaintiff visited Jorge Estrada, M.D. ("Dr. Estrada") for an

---

Manual of Mental Disorders, p. 34 (2000).

evaluation on June 20, 2005, complaining of diabetes, heart problems, hypertension and arthritis.  (Tr. 291).  Plaintiff reported that he worked as an auto mechanic until 1998 and that he stopped working because of his pain.  (Tr. 291).  Plaintiff reported that he quit smoking in February 2005.  (Tr. 292).  Dr. Estrada found plaintiff to be alert, not in distress and to have a normal gait.  (Tr. 293).  Additionally, plaintiff was able to squat and get up and bend and touch his fingers to within three inches of the floor with no difficulty.  (Tr. 293).  At this time, plaintiff denied chest pain and did not experience shortness of breath while walking.  (Tr. 291).  Dr. Estrada also noted plaintiff's affect and mental status as normal.  (Tr. 293).

On June 28, 2005, Frederick Cremona, M.D. ("Dr. Cremona"), a non-examining medical consultant to the SSA, completed an RFC assessment with respect to plaintiff's physical limitations. (Tr. 300-07).  Dr. Cremona opined that plaintiff was capable of occasionally lifting or carrying 20 pounds, frequently lifting or carrying ten pounds, able to stand or walk for approximately six hours during an eight hour work day, able to sit with breaks for about six hours during an eight hour work day and could push or pull without limitation.  (Tr. 301).  Dr. Cremona also found plaintiff able to climb, balance, stoop, kneel, crouch and crawl. (Tr. 302).  Dr. Cremona found plaintiff to have good grip strength bilaterally and that plaintiff's claims were partially

credible based on the medical evidence in the record.  (Tr. 307).

On March 13, 2006, Machelle Williams, D.O. ("Dr. Williams"), plaintiff's treating physician, completed a Medical Assessment of Ability to do Work Related Activities form.  (Tr. 321-22).  Dr. Williams opined that plaintiff could never lift or carry any weight either occasionally or frequently during an eight hour work day.  (Tr. 321).  Dr. Williams found plaintiff could stand or walk for less than two hours in an eight hour work day and sit for two hours in an eight hour work day.  (Tr. 321).  Dr. Williams stated that plaintiff could never climb, stoop, crouch, kneel or crawl, but could occasionally balance.  (Tr. 322).  She also found that plaintiff could not reach, handle, push or pull, but could finger, see, hear and speak.  (Tr. 322).

Dr. Williams wrote an accompanying letter on the same date describing plaintiff's condition after treating him for two years.  (Tr. 323).  She stated that plaintiff has difficulty with meaningful work because of the pain from his cervical disc disease and that plaintiff is disabled because of severe pain. (Tr. 323).  Dr. Williams also claimed that plaintiff sustained irreversible heart damage and has extremely poor exercise tolerance.  (Tr. 323).  Additionally, Dr. Williams stated that plaintiff experiences shortness of breath after walking 50 feet at a slow pace.  (Tr. 323).

Plaintiff moved to Massachusetts in 2006 and on September

25, 2006, he visited a psychologist, Jeffrey Schumer, Psy.D. ("Dr. Schumer") for an evaluation.  (Tr. 327).  Dr. Schumer noted that plaintiff struggled with learning in grade school because of problems with attention and focusing.  (Tr. 328).  The psychologist diagnosed plaintiff with major depression and features of paranoid personality disorder.  (Tr. 330).  Dr. Schumer described plaintiff as cooperative, pleasant and calm. (Tr. 328).  Dr. Schumer found that plaintiff showed adequate frustration tolerance and responded appropriately to instructions.  (Tr. 328).  He also noted plaintiff's health, financial, economic and social problems and concluded that plaintiff functioned at a GAF of 50[3] at the highest in the past year.  (Tr. 330).

Plaintiff had a consultation with Athanasios Flessas, M.D. ("Dr. Flessas"), a cardiologist at Caritas Good Samaritan Medical Center in Massachusetts, on June 21, 2006, due to chest pain which persisted for a week.  (Tr. 368).  Dr. Flessas noted that on a recent stress test plaintiff exercised for nine minutes which indicated very good functional capacity.  (Tr. 368). Plaintiff complained of pain in the shoulders, elbows and knees

---

[3] A GAF of 41-50 represents "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 34 (2000).

at this time.  (Tr. 368).  Dr. Flessas found plaintiff's presentation to be atypical for myocardial ischemia and recommended discharge upon a normal exercise stress test.  (Tr. 368).  The next day, plaintiff was discharged after exercising for nine minutes with no chest discomfort or pain which is considered a normal exercise capacity.  (Tr. 371, 409).

On September 5, 2006, plaintiff met with Lewis Sudarsky, M.D. ("Dr. Sudarsky"), a neurologist at Brigham and Women's Hospital in Boston, Massachusetts, who noted that plaintiff's left carotid artery was completely blocked.  (Tr. 377). Plaintiff sought treatment because he was lightheaded and disoriented upon turning his head and neck.  (Tr. 377).  Dr. Sudarsky noted that plaintiff had normal coordination and gait and that his mental status was good which would indicate that there was no correlation between plaintiff's complaints and his presentation at the time of the evaluation.  (Tr. 377).

On April 12, 2007, George Brown, M.D. ("Dr. Brown"), an orthopedic surgeon at Brockton Hospital, examined plaintiff upon complaints of shoulder pain for which he had never sought medical attention.  (Tr. 388).  Dr. Brown opined that plaintiff experienced crepitus but that his "range of motion lacked only 20 degrees of abduction on both sides and slight external rotation on both sides."  (Tr. 388).  Dr. Brown diagnosed plaintiff with osteoarthritis in both shoulders and prescribed Ibuprofen.  (Tr.

388).

On April 13, 2007, Benjamin Lightfoot, M.D. ("Dr. Lightfoot") of the Brockton Neighborhood Health Center evaluated plaintiff's physical capacity and found that he could not sit for more than four hours, stand for more than two hours or walk for more than two hours during an eight hour work day.  (Tr. 373). Dr. Lightfoot also found plaintiff could lift up to six pounds frequently and six to ten pounds occasionally and could carry up to six pounds frequently and six to ten pounds occasionally. (Tr. 373).

On May 11, 2007, plaintiff went to Caritas Good Samaritan Medical Center because of loss of sensation in his left arm and central chest burning.  (Tr. 402).  Andrew Kriegel, M.D., a cardiologist, recommended an exercise stress test on an outpatient basis because plaintiff's pain did not persist.  (Tr. 405).  On May 14, 2007, plaintiff underwent a cardiac stress test and had fair exercise tolerance with no chest pain.  (Tr. 394).


II.  Plaintiff's SSA Hearings

At the initial hearing, plaintiff testified that due to the combination of his herniated disc, cervical disc bulge, two heart attacks, three stents, angina, shortness of breath, blocked carotid artery and diabetes he is unable to work.  (Tr. 416). The ALJ noted that due to the exercise stress test in 2006 where

plaintiff exercised for nine minutes he would not issue a decision in plaintiff's favor based on the record alone because it demonstrated a good exercise capability.  (Tr. 416). Plaintiff testified that he was unable to work because of joint and chest pain.  (Tr. 420).  Specifically, plaintiff testified to having significant pain in his neck, shoulders and legs.  (Tr. 421).  Plaintiff has not worked since 1997 or 1998 and currently receives welfare and food stamps.  (Tr. 420).  He also testified that when he took nitroglycerine for his chest pain it went away. (Tr. 420).  Plaintiff stated that he has trouble with memory loss because his carotid artery is completely blocked and there is no way to treat the condition.  (Tr. 422).  Plaintiff claimed that his sleep is interrupted by diabetes quite frequently and that as a result he experiences fatigue during the day.  (Tr. 422).  Also as a result of diabetes, plaintiff testified that he has some vision issues and he experiences numbness in his arms and fingers.  (Tr. 423).

At the supplemental hearing, John Pella, M.D. ("Dr. Pella"), a medical consultant to the SSA, testified as a medical expert and opined that stress testing in the past did not provide evidence of ischemia but the most recent stress test indicated mild ischemia.  (Tr. 431).  Dr. Pella further testified that before the year 2000, the medical records were too sparse to provide an opinion on plaintiff's medical status.  (Tr. 432).

13

The record is more detailed as of 2004 when plaintiff had his
first heart attack.  (Tr. 433).  Dr. Pella stated that according
to the medical records, plaintiff was capable of performing light
work[4] with restrictions because of his shoulder and neck pain.
(Tr. 433).  Specifically, raising his arm and using a push pull
motion were especially painful for plaintiff but motion from the
elbow to the hands was not an issue.  (Tr. 433-34).
Additionally, plaintiff is unable to work with dangerous
machinery or from heights because of his cerebral vascular
disease and use of narcotic analgesics.  (Tr. 433).

---

[4]  Light work and sedentary work are defined in 20 C.F.R. §
404.1567 as follows:

> (a) Sedentary Work.  Sedentary work involves lifting no more
> than 10 pounds at a time and occasionally lifting or
> carrying articles like docket files, ledgers, and small
> tools.  Although a sedentary job is defined as one which
> involves sitting, a certain amount of walking and standing
> is often necessary in carrying out job duties.  Jobs are
> sedentary if walking and standing are required occasionally
> and other sedentary criteria are met.

> (b) Light Work.  Light work involves lifting no more than 20
> pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category when it
> requires a good deal of walking or standing or when it
> involves sitting most of the time with some pushing or
> pulling of arm or leg controls.  To be considered capable of
> performing a full or wide range of light work, you must have
> the ability to do substantially all of these activities.  If
> someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit
> for long periods of time.

Next, plaintiff testified regarding his daily life.  (Tr. 434).  Plaintiff mostly watches television during the day.  (Tr. 435).  At times, he goes outside to read a book but he often has trouble remembering the plot.  (Tr. 435-36).  Plaintiff showers once every few days and dresses on his own.  (Tr. 436). Plaintiff used to cook but does not anymore because it is too strenuous.  (Tr. 436-37).  Plaintiff drives occasionally to pick up his medication and does not need to be reminded to take it. (Tr. 437-38).  Plaintiff stated that he has trouble tilting and turning his head.  (Tr. 438).  Plaintiff testified that he mows the lawn on a riding mower and claims that he can only lift about five pounds at a time.  (Tr. 439).  In general, plaintiff's pain makes plaintiff more angry, moody and irritable.  (Tr. 440). Plaintiff claimed that his medical records were sparse before moving to Massachusetts in 2006 because he could not afford health insurance or medical care in Texas.  (Tr. 441).  Plaintiff claimed that he becomes short of breath quite easily, even from talking.  (Tr. 442).  After the first stents were inserted, plaintiff felt better but after the second procedure he felt worse and his memory issues began.  (Tr. 443).

Plaintiff's sister, Marlene Peters, then testified and claimed that plaintiff originally was fun loving and easy going, but is quick to anger and depressed now.  (Tr. 445-46).  Finally, a vocational expert, Steven Sachs ("Sachs"), testified.  (Tr.

447).  Sachs testified that a hypothetical claimant with the same background, education and physical limitations as plaintiff would not be capable of performing his past work and that his acquired work skills would not be transferable.  (Tr. 448-49).  Sachs further testified that such a hypothetical claimant could work as an electronic assembler, production inspector or a production worker.  (Tr. 449).

On August 29, 2007, the SSA ruled that plaintiff was disabled when he turned 55 on April 22, 2007.  (Tr. 12-14).  The ALJ reasoned that before this date, plaintiff was a "younger individual age" where "transferability of job skills is not material to the determination of disability."  (Tr. 23).  Once plaintiff turned 55, he became a "person closely approaching advanced age" and was not "able to transfer any job skills to other occupations."  (Tr. 23).  Plaintiff appealed to the SSA to review its decision on October 11, 2007, and the appeal was denied on November 30, 2007.  (Tr. 5-8).


                          DISCUSSION

I.   Jurisdiction and Standard of Review

When the Appeals Council for the Office of Disability Adjudication and Review denies review, the ALJ's decision becomes the Commissioner's final decision.  20 C.F.R. §§ 404.981 & 416.1481.  This court has the power to affirm, modify or reverse

the ALJ's decision with or without remanding the case for a hearing.  42 U.S.C. § 405(g).  The ALJ's findings of fact are conclusive if supported by substantial evidence.  See <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971); <u>Seavey v. Barnhart</u>, 276 F.3d 1, 9 (1st Cir. 2001); <u>Manso-Pizzaro v. Secretary of Health and Human Services</u>, 76 F.3d 15, 16 (1st Cir. 1996).  The ALJ's findings of fact are not conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999).

"Even if the record could arguably support a different result," this court must affirm the ALJ's decision if supported by substantial evidence.  <u>Rodriguez-Pagan v. Secretary of Health and Human Services</u>, 819 F.2d 1, 3 (1st Cir. 1997).  "Substantial evidence is more than a scintilla of evidence that a reasonable person could find sufficient to support the result."  <u>Musto v. Halter</u>, 135 F.Supp.2d 220, 225 (D.Mass. 2001).  "Substantial evidence exists when a reasonable mind, reviewing evidence in the record as a whole, could accept it as adequate to support the Comissioner's conclusion."  <u>Id.</u> (citing <u>Rodriquez v. Secretary of Health and Human Services</u>, 647 F.2d 218, 222 (1st Cir. 1981)).

II.   <u>Disability Determination</u>

The Social Security Act defines a disability as the:

> [I]nability to engage in any substantial gainful
> activity by reason of any medically determinable
> physical or mental impairment which can be expected to
> result in death or has lasted or can be expected to
> last for a continuous period of not less than 12
> months.

42 U.S.C. § 423(d)(1)(A).  The impairment must be of such
severity that the claimant "'is not only unable to do [his]
previous work but, considering [his] age, education, and work
experience, engage in any other kind of substantial work which
exists in the national economy.'"  Deblois v. Secretary of Health
and Human Services, 686 F.2d 76, 79 (1st Cir. 1982) (quoting 42
U.S.C. § 423(d)(2)(A)).

To determine whether a claimant is disabled, the SSA uses a
five step evaluation process.  20 C.F.R. §§ 404.1520 & 416.920.
Under the first step, if a claimant is employed, he is not
disabled.  Goodermote v. Secretary of Health and Human Services,
690 F.2d 5, 6 (1st Cir. 1982).  If the claimant is not engaged in
substantial gainful activity, the Commissioner moves to the next
step.

At step two, the Commissioner evaluates whether the claimant
has a severe impairment.  Id.  A severe impairment meets the
durational requirement and "significantly limits your physical
ability to do basic work activities."  20 C.F.R. §§ 404.1509 &
1520(c).  If the claimant does not have a severe impairment, he
is not disabled.  Goodermote, 690 F.2d at 6.  If the claimant has
a severe impairment, the analysis proceeds to the third step.  At

this time, the Commissioner evaluates whether the claimant's impairments meet or equal any of the impairments listed in Appendix 1, Part 404, Subpart P of the Code of Federal Regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has a listed impairment or the equivalent, the claimant is disabled.  Goodermote, 690 F.2d at 6.  Otherwise, the Commissioner moves to the fourth step and decides whether the claimant has the RFC to perform his past work.  20 C.F.R. § 404.1520(e).  Past relevant work is defined as work the claimant has performed in the last 15 years.  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to do past relevant work, he is not disabled.  Goodermote, 690 F.2d at 7.

Otherwise, the Commissioner proceeds to the fifth step and evaluates whether the claimant's RFC, age, education and work experience suggest that he could perform another job in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  If so, the claimant is not disabled.  "The plaintiff bears the burden in the first four steps of showing that she is disabled."  Rohrberg v. Apfel, 26 F.Supp.2d 303, 306 (D.Mass. 1998).  "Once the claimant has established that she is unable to return to her former employment, however, the burden shifts to the Commissioner to prove the fifth step."  Id. at 306-07.

Applying the foregoing sequential analysis, plaintiff has not engaged in any substantial gainful activity since January 1,

1996.  (Tr. 15).  Thus, the ALJ correctly proceeded to step two
of the analysis.  At the second step, the ALJ found that
plaintiff had severe medical impairments, including left shoulder
degenerative joint disease, right shoulder rotator cuff
tendinopathy, diabetes mellitus, coronary artery disease and
cervical spine degenerative joint disease.  (Tr. 15).  After
finding a severe impairment, the ALJ correctly proceeded to the
third step.  Applying the third step, the ALJ found that
plaintiff "does not have an impairment or combination of
impairments that meets or medically equals one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."  (Tr.
16).  As substantial evidence supports the ALJ's determination
that plaintiff did not meet a listed impairment, the disability
analysis correctly proceeded to step four.

    At the fourth step, the ALJ found that plaintiff had the RFC
to perform light work except for the ability to conduct work at
unprotected heights, around dangerous machinery or automotive
equipment or activities that require joint motion at the right
shoulder.  (Tr. 17).  Additionally, the ALJ concluded that the
side effects of plaintiff's medications moderately limit his
ability to understand, remember and carry out complicated or
detailed directions.  The medications also moderately impair his
ability to maintain attention and concentration.  (Tr. 17).
Finally, the ALJ found that plaintiff was unable to perform any

past relevant work which included work as a truck driver and an auto parts store worker.  (Tr. 22).

Next, the ALJ proceeded to step five and considered plaintiff's age, education, work experience and RFC in determining whether jobs exist in significant number in the national economy that plaintiff could perform.  (Tr. 23-24). Focusing on plaintiff's age, the ALJ found that as of April 22, 2007, when plaintiff turned 55 and became a "person closely approaching advanced age," transferability of job skills became material to the analysis.  (Tr. 23).  As a result, the ALJ found that as of age 55 plaintiff "has not been able to transfer any job skills to other occupations" and "considering the claimant's age, education, work experience, and RFC, there are not a significant number of jobs in the national economy that the claimant could perform."  (Tr. 23-24).  Thus, the ALJ found that plaintiff was disabled as of April 22, 2007.  (Tr. 24).

Plaintiff argues that the ALJ's findings that plaintiff was capable of light work and not disabled before April 22, 2007, were legal errors because they lack substantial evidence. (Docket Entry # 9).  Specifically, plaintiff argues that the ALJ should have given controlling weight to the opinion of plaintiff's treating physician, Dr. Williams, which would have placed plaintiff in the sedentary level of work or lower. (Docket Entry # 9).  As such, he would have been found disabled

before age 55 pursuant to Medical-Vocational Rule 201.00(g).[5]
(Docket Entry # 9).  Plaintiff further argues that the ALJ
dismissed evidence of a serious psychiatric impairment.  (Docket
Entry # 9).  As a result of these errors, plaintiff argues that
substantial evidence exists in the record to support a finding of
disability as of June 3, 2004, the date of application when
plaintiff was 52 years old.  (Docket Entry # 9).

"The law in this circuit does not require ALJs to give
greater weight to the opinions of treating physicians." Arroyo
v. Secretary of Health and Human Services, 932 F.2d 82, 89 (1st
Cir. 1991).  Although an ALJ normally gives more weight to a
treating physician's opinion, it is not always the case.  Where
the treating physician's opinion "is inconsistent with other
evidence in the record, the conflict is for the Commissioner--and
not the court--to resolve." Costa v. Astrue, 565 F.Supp.2d 265,
271 (D.Mass. 2008); see also Arroyo, 932 F.2d at 89 (affirming
where Commissioner relied on testifying physician's opinion
rather than treating physician); Gonzalez-Ayala v. Secretary of

---

[5]  Medical-Vocational Rule 201.00(g) states:

> Individuals approaching advanced age (age 50-54) may be
> significantly limited in vocational adaptability if
> they are restricted to sedentary work.  When such
> individuals have no past work experience or can no
> longer perform vocationally relevant past work and have
> no transferable skills, a finding of disabled
> ordinarily obtains.

20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(g).

Health and Human Services, 807 F.2d 255, 256 (1st Cir. 1986)
(affirming Commissioner's decision where treating physician's
opinion on physical limitations contradicted other examining
physician's findings of full range of motion).

Dr. Williams's Medical Assessment of Ability to do Work
Related Activities states that due to pain in plaintiff's
shoulders and arms with activity, plaintiff could not lift or
carry any weight either occasionally or frequently.  (Tr. 321).
Dr. Williams opined that plaintiff could stand or walk for less
than two hours in an eight hour work day and could sit for two
hours in an eight hour work day.  (Tr. 321).  Dr. Williams found
that plaintiff could balance occasionally in an eight hour work
day but could never climb, stoop, crouch, kneel or crawl.  (Tr.
322).  Dr. Williams further found that plaintiff could not reach,
handle, push or pull but could finger, see, hear and speak.  (Tr.
322).  Dr. Williams also stated that plaintiff had cervical disc
disease which affected his upper extremity strength and heart
disease.  (Tr. 322).

In an accompanying letter, Dr. Williams stated that she has
treated plaintiff for two years and diagnosed him with cervical
disc disease, hypertension, diabetes mellitus, hyperlipidemia and
coronary artery disease.  (Tr. 323).  Dr. Williams opined that
since 2004, plaintiff has had difficulty working because of his
cervical disc disease pain and that plaintiff has had two heart

23

attacks.  (Tr. 323).  Dr. Williams further claimed that plaintiff is disabled because of his neck and shoulder pain which is worsened by activities using upper extremities and irreversible heart damage.  (Tr. 323).  Finally, Dr. Williams stated that plaintiff has extremely poor exercise tolerance and she does not believe that his overall condition will ever improve and he will remain disabled.  (Tr. 323).

Additionally, after moving to Massachusetts, Dr. Lightfoot examined plaintiff and found that he could not sit for more than four hours, stand for more than two hours or walk for more than two hours during an eight hour work day.  (Tr. 373).  Dr. Lightfoot also found plaintiff could lift up to six pounds frequently and six to ten pounds occasionally and could carry up to six pounds frequently and six to ten pounds occasionally. (Tr. 373).

There are a number of observations in the medical records which are inconsistent with the opinions of the treating physicians, Dr. Williams and Dr. Lightfoot.  Dr. Dosunmu examined plaintiff on October 12, 2004, and found plaintiff had a normal gait, no signs of unsteadiness, the ability to squat and get back up without difficulty and the ability to bend over half way. (Tr. 212).  Dr. Dosunmu also found plaintiff's range of motion to be normal pursuant to the standards of the American Association of Orthopedic Surgeons.  (Tr. 213).  Dr. Estrada examined

plaintiff on May 31, 2005, and found plaintiff had a normal gait and was able to squat and get back up and bend and touch his fingers to within three inches of the floor without difficulty. (Tr. 293). Dr. Estrada found plaintiff able to tiptoe without difficulty. (Tr. 293). Finally, Dr. Estrada found plaintiff had no muscle weakness or atrophy and good grip strength on both sides. (Tr. 293).

These observations are significant because Social Security Ruling 85-15 states that where an individual can stoop and bend occasionally, the "light occupational base is virtually intact." Thus, it was within the ALJ's discretion to place plaintiff in the light work category after relying on the observations from these two distinct treating physicians.

Additionally, Dr. Brown examined plaintiff on April 12, 2007, and found osteoarthritis in both shoulders but plaintiff lacked only 20 degrees of abduction on both shoulders and slight external rotation on both sides. (Tr. 388). Dr. Brown prescribed Ibuprofen as treatment, from which the ALJ could infer that plaintiff's pain was not so severe. See Albors v. Secretary of Health & Human Services, 817 F.2d 146, 147 (1st Cir. 1986) (finding fact that the plaintiff was prescribed aspirin supported ALJ's finding pain not as severe as claimed).

Additionally, two non-examining physicians evaluated plaintiff's RFC. When viewed with Dr. Williams's own assessment,

each doctor formed a different opinion of plaintiff's physical limitations.  For example, Dr. Dolan found plaintiff could frequently carry or lift 25 pounds, Dr. Cremona found plaintiff could frequently carry or lift ten pounds, and Dr. Williams found plaintiff could not frequently carry or lift any weight.  (Tr. 203, 301, 321).  Finally, Dr. Pella, the medical expert at plaintiff's supplemental hearing, testified that plaintiff was capable of light work with limitations.  (Tr. 433).

It was the duty of the ALJ to resolve these conflicts in the evidence.  See Rodriguez-Pagan, 819 F.2d at 3.  Furthermore, these inconsistencies gave rise to the ALJ's decision to not assign controlling weight to Dr. Williams's opinion.  See Coggon v. Barnhart, 354 F.Supp.2d 40, 50-56 (D.Mass. 2005) ("'the [ALJ] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if the evidence consists of reports from non-treating doctors'").

In sum, there is substantial evidence from other treating physicians and non-treating physicians which contradicts the opinions of Dr. Williams and Dr. Lightfoot with respect to the extent of plaintiff's physical limitations due to back, neck and shoulder pain.  Although some of the evidence could have supported a different result, this court must affirm the ALJ's decision to place plaintiff in the light work category.  See Rodriguez-Pagan, 819 F.2d at 3 ("[w]e must affirm the Secretary's

resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."); see also Berrios Lopez v. Secretary of Health and Human Services, 951 F.2d 427, 431-32 (1st Cir. 1991) (affirming Commissioner's decision where ALJ credited opinions of non-examining physicians over treating physician); Lacroix v. Barnhart, 352 F.Supp.2d 100, 114 (D.Mass. 2005) (affirming when Commissioner's decision based on substantial evidence).

Although Dr. Williams mentions plaintiff's heart attacks in her letter as a basis for disability, there is not substantial evidence in the record indicating that this particular condition prevents plaintiff from performing light work.  Plaintiff performed exercise stress tests in July 2004, June 2006 and May 2007 and had good to fair exercise tolerance on all three examinations.  (Tr. 311, 394 & 409).  The results of these three tests explicitly contradict Dr. Williams's assertion in her letter that plaintiff has extremely poor exercise tolerance. (Tr. 323).  Additionally, in June 2005 plaintiff denied chest pain and did not experience shortness of breath while walking. (Tr. 291).

Given these discrepancies, the ALJ, reviewing the record as a whole, could have found Dr. Williams's opinion regarding plaintiff's physical limitations due to his cardiovascular problems not credible.  See Musto, 135 F.Supp.2d at 225 ("[t]he

Commissioner makes determinations as to credibility and draws inferences from the record evidence."); <u>Costa</u>, 565 F.Supp.2d at 272 (affirming Commissioner's decision where the ALJ considered opinions of all medical experts as well as the plaintiff's medical records).

Plaintiff also argues that the ALJ ignored evidence of a serious psychiatric impairment, citing Dr. Schumer's report from September 25, 2006.  The record indicates a discrepancy between Dr. Schumer's report and Dr. Thompson's report.

Dr. Schumer found plaintiff to have a GAF score of 50 indicating depression and social and economic difficulties (Tr. 330) yet Dr. Schumer also described plaintiff as cooperative, pleasant and calm.  (Tr. 328).  Furthermore, Dr. Schumer found plaintiff showed adequate frustration tolerance and responded appropriately to instructions.  (Tr. 328).

Dr. Thompson evaluated plaintiff on December 16, 2004, and found that plaintiff was able to control his anger, that his purported problems with memory and confusion were not observed during the evaluation and that plaintiff's cognitive functioning was relatively intact.  (Tr. 217).  Dr. Thompson found plaintiff to have a GAF score of 60.  (Tr. 217).  Additionally, Dr. Sharifian found plaintiff not to have a severe mental impairment. (Tr. 218).

These observations noted in the record do not indicate a severe psychiatric impairment.  See <u>Berrios Lopez</u>, 951 F.2d at 429 (finding no severe impairment where the plaintiff had adjustment disorder and depressed mood yet adequate affect, normal flight of ideas and no delusions, phobias, obsessions or perceptual disturbances).  Additionally, plaintiff never pursued mental health treatment.  Therefore, the ALJ properly found no severe psychiatric impairment.  See <u>Irlanda</u>, 955 F.2d at 770 (affirming Commissioner's decision where plaintiff did not pursue mental health treatment).

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[6] that plaintiff's motion to reverse or remand the decision of the Commissioner (Docket Entry # 8) be **DENIED** and that the Commissioner's motion affirming the decision (Docket Entry # 11) be **ALLOWED.**

 /s/ Marianne B. Bowler
**Marianne B. Bowler**
United States Magistrate Judge

---

[6]   Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and accompanied by the basis for such objection.  Any party may respond to another party's objections. Failure to file objections within the specified time waives the right to appeal the order. <u>See</u> Rule 72, Fed. R. Civ. P.